GEORGE J. TARULIS, Plaintiff-Appellee, v. PHILIP G. PRASSAS *et al.*, Defendants-Appellants (Laurette Rathz, Defendant).

First District (2nd Division)   No. 1—91—2991

Opinion filed September 22, 1992.—Modified on denial of rehearing November 17, 1992.

Schoen & Smith, Ltd., of Chicago (Lee J. Schoen and Carolyn M. Diggins, of counsel), for appellants.

Pavalon & Gifford, of Chicago (Eugene I. Pavalon, Michael L. Lauzon, and Gallagher & Petrak, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

On the afternoon of November 8, 1988, defendant Laurette Rathz was traveling east on 103rd Street near Kedzie in Chicago, heading for a shopping center owned by defendants Philip G. Prassas, Elaine Chipman, Philip G. Prassas Family Trust, and Josephine D. Prassas Trust No. 1 (the Prassas defendants). As Rathz turned left into the driveway of the shopping center parking lot, she lost control of the car. She came to a stop after hitting the driver's side of a vehicle belonging to plaintiff George J. Tarulis, who was getting out of his car. Tarulis sued the Prassas defendants and Rathz as a result of his injuries. The Prassas defendants filed a contribution claim against Rathz, who filed her own contribution claim against them. A jury found Rathz 88% liable and the Prassas defendants 12% liable, and it awarded Tarulis $1.4 million. The circuit court denied the Prassas defendants' motions for a directed verdict during the trial and for judgment notwithstanding the verdict afterward. The Prassas defendants appeal both orders; they also claim error arising from admission of certain evidence, exclusion of other evidence, and confusing verdict forms. For the reasons stated below, we reverse.

In its final version, Tarulis' complaint alleged that the Prassas defendants were negligent in that they (1) located the wheel stop too close to the east side of the driveway; (2) did not paint the wheel stop a bright color or otherwise provide sufficient contrast to enable an eastbound driver to see it; (3) did not define, by striping or otherwise, the edges of the driveway, so people making a left turn into the parking lot were likely not to see the wheel stop; (4) allowed the slope of the driveway to exceed the maximum allowed under the Chicago municipal code, which limited the visibility of the stop; and (5) did not inspect the driveway and the adjacent area on the east to determine whether the driveway was reasonably safe for those turning left from 103rd Street. Defendants filed two summary judgment motions, but the record contains no order disposing of either motion.

Prior to trial, defendants filed a motion *in limine*. Among the items it addressed were the exclusion of evidence of subsequent remedial measures and of "mention of insurance *** which would severely prejudice defendants['] case." The circuit court's order states only that "[t]he Defendants, PRASSAS FAMILY's, various and routine Motions in Limine have been agreed upon by all parties."

Tarulis began presentation of his case with testimony by the investigating police officer. Officer Susan Urban stated that when she questioned Rathz at the scene of the accident, Rathz said she had hit

a wheel stop on the east side of the driveway, lost control of her car, and hit Tarulis. Officer Urban did not recall if the driveway had striping at its edges in 1988.

Rathz, who was 86 years old at the time of the accident, testified that she was traveling no more than five miles per hour when she entered the driveway, having stopped to wait for westbound traffic on 103rd Street to pass before she turned left into the parking lot. She remembered nothing between hitting the wheel stop and coming to rest after sideswiping Tarulis' car, other than being in shock. When asked if the wheel stop had any striping on it in 1988, she replied "Nothing. No." She stated that the day in question was the first time that she ever had turned left into the lot from 103rd Street; even though she had lived in the area for over 30 years and had entered that driveway "many times," she had been driving only 10 years and had always entered from the right, traveling from her home to the east.

Tarulis described the accident as follows:

> "And as I stood up [while leaving my car,] facing the east, I saw a car accelerate and keep accelerating its speed pointing directly at me, and I realized something was wrong. So I tried to get back into the car, and I got my *** keister back into the seat, and I tried to pull up my legs; and as I got my legs up underneath the panel, the lower rim of my door, I—this woman was right on top of me with her—she hit the—hit the [shopping cart] caddies that were in the—in front of me, and they went up in the air. And I saw her with her arms clutched on the—on the wheel, and her eyes wide with fear. And then her car swung around and sandwiched my—sandwiched my ankles beneath—that were beneath the door rim with her car. Her car swung completely around."

He agreed that Rathz was already inside the parking lot, about 50 feet away, when he first saw her. He "ha[d] no idea" at trial why Rathz's car came toward him, and he was unable to say the highest speed Rathz's car had reached.

Plaintiff's expert, Roger Keiser, was an architect who, in the six years he worked for other architects before beginning his own practice, designed at least 100 parking lots, but none in the last 18 years. Keiser explained that architects are responsible for safety considerations in parking lot design and that only "basic and general engineering and common sense practices" are involved. He testified that as a reference work, he customarily used "Time-Saver Standards for Site Planning" (TimeSavers), which he termed a "bible" for architects

and which contains compilations of standards resulting from years of research and development. He explained that the wheel stops in the parking lot were precast concrete, approximately six inches high and eight feet long, and that, according to his measurements two days prior to the trial, the wheel stop at the east side of the driveway was 11 inches from the east side of the driveway. The sole purpose of such stops when placed at the perimeter of a parking lot, he stated, is to prevent cars from extending over the sidewalk. In Keiser's opinion, the placement and coloring of the wheel stop here "lack[ed] ready visibleness" to drivers turning left into the parking lot. He then explained that

> "making a left turn, you're quite a distance away and the monotone of color [of the sidewalk and the wheel stop and the driveway], *** with the clutter of the parking lot, *** [make it] very difficult to judge where [the wheel stop] is when you're crossing three lanes of oncoming traffic."

He further stated that the wheel stop should have been placed "at least one and a half car widths [away from the driveway] to get it away from the close proximity of that entrance." Placed where it was, he continued, standard practice would be to make it readily identifiable by painting it with contrasting stripes such as orange or yellow. He also stated that standard practice called for painting the driveway boundaries yellow or orange, to make them readily identifiable, or putting a fluorescent cone out to define the boundary. Later, however, he conceded that TimeSavers merely advises contrast and definition, without specifying how to achieve it. He also stated that the minimum acceptable height for a permanent object in such a location was 24 inches.

Keiser testified that with regard to the driveway slope, as slope increases, sightlines decrease, creating a safety problem. Although the dimensional difference between the maximum driveway slope allowed by the municipal code of the City of Chicago and the actual slope of the driveway at issue was approximately one-half inch, he later conceded that the municipal code section he referred to concerned slope requirements for clear and unobstructed passage and drainage, not for sightlines.

After Tarulis presented his case, the Prassas defendants moved for a directed verdict, arguing that Tarulis had failed to meet his burden of proof against them with regard to causation. In particular, they emphasized that Rathz had never testified that she hit the wheel stop because she could not or did not see it, so to permit a jury to infer that their having not properly located or defined the wheel stop

caused the accident would be improper as speculation. The court denied the motion.

Paul Box, a licensed engineer testifying for the Prassas defendants, headed his own traffic engineering consultant firm and was co-editor and co-author of the current Manual of Traffic Engineering Studies. Half his time was spent investigating cases, with the other half devoted to traffic studies and the like; he also had written a textbook, Parking Principles, on the design of parking facilities, as well as over a hundred other related publications. Often, he produced parking lot "geometric design plans," which he gave to architects or civil engineers to incorporate into their projects. He described wheel stops as precast concrete, seven or eight inches wide at the top and 10 inches at the bottom, approximately seven feet long, held in place by foot-long pins driven into the ground.

When asked about dimensions in parking lot design, Box stated that engineers make the ultimate decision based on flexible guidelines, not on "standards," which to him meant inflexible rules. As for the driveway and wheel stop here, Box stated that "the edge of [the wheel stop was] two feet or so east of the east edge of the driveway we're talking about." He remarked that on Tarulis' survey, this dimension scaled as 2.4 feet. Two feet was an acceptable distance between the stop and the edge of the driveway, he commented, saying that "[i]f [he] were designing the lot and putting in wheel stops, that's precisely where [he] would put it. [He] s[aw] nothing wrong with the location of it, the setback or the two feet away from the edge of the driveway."

As for contrast, Box agreed that over time, the parking lot surfacing material here (asphalt) becomes lighter and the driveway, sidewalk, and wheel stop material (concrete) becomes darker. In his view, however, the contrast was adequate in 1990, when he first saw the lot; in his own projects, he did not recall ever painting concrete stops. He had no knowledge whether in 1988 there was a yellow stripe along the east edge of the driveway or if the wheel stop he saw when he went to the site in 1990 was the same as the one there at the time of the accident in 1988. He knew of no national guidelines under which stops should be painted yellow, nor of any State standards for wheel stops; he also testified that an orange cone near the wheel stop at issue was "simply not an appropriate device to use." He had never heard of TimeSavers until this case, and he disagreed with its recommendation that a permanent fixed object near a driveway should be at least two feet high, because at that height it would limit visibility. He also testified that no signage was needed to define the driveway be-

cause "the location of the driveway and its outlines are clearly obvious to anyone with normal visi[on]."

As for the driveway slope, Box testified that the current guideline of the Institute of Traffic Engineers for this type of driveway was "about 6 percent in the first 10 feet and not more than 10 percent maximum." Although he later conceded that the proposed guideline from the Institute of Traffic Engineers, written by a committee he chaired, recommends that the angle from a driveway to a sidewalk should not exceed 8%, he added that the 8% figure was an error and should be 10%. He stated that the difference between a slope of 8% and the municipal code requirement of 8.3% translates into about one-half inch in height for the driveway here, which he termed "insignificant." Asked if an increase in driveway slope could affect a driver's sightline, he replied "[n]ot necessarily." The only reasons he knew for regulating driveway slope were drainage, avoiding damage to the undercarriage of a car, and limiting the likelihood of slippage under icy conditions.

On cross-examination, Tarulis' counsel asked Box whether he had developed a business in providing expert testimony and consulting services to lawyers and insurance companies. Box responded, "No." The Prassas defendants immediately moved for a mistrial for violation of the order granting their motion *in limine* barring any reference to insurance. The court denied the motion.

Harry Olson, the shopping center caretaker since 1971, then testified. He was not at the shopping center on the day of the accident, and he did not hear of it until about two days later. He stated that one of the Prassas defendants' exhibits, a picture of the driveway taken in 1990, depicted how the lot looked in November 1988, including the unpainted wheel stop and that the wheel stop at issue had been in the same location for 35 years. He further testified that the stripe on the east side of the driveway was there in November 1988.

Philip Prassas, the manager of the property since 1984, testified next. His father built the shopping center and his family owned it at the time of the accident. As manager, Philip Prassas' responsibilities included the decisions concerning the maintenance of the parking area. He testified that the lot had been striped in 1985 and, most recently, in June 1987. In his deposition, however, he had stated that the striping had been done "I think just once" since 1988, and when asked if the yellow stripe at the east side of the driveway was there prior to the accident, he replied "I think so. But it's not a certainty." Like Olson, he said that the exhibit photograph, which shows a yellow

stripe along the east edge of the driveway, "truly and accurately" depicted the appearance of the lot at the time of the accident in 1988.

At the close of the trial, the Prassas defendants orally renewed their motion for a directed verdict against Tarulis. They also moved for a directed verdict on the contribution claim. The court denied both motions. The parties then tendered jury instructions and verdict forms, some of which the circuit court gave over defendants' objections. The verdict forms too evoked objections from the Prassas defendants, who also orally moved for a mistrial for mention of subsequent remedial repairs.

The jury returned a verdict of liability for both Rathz and the Prassas defendants. The Prassas defendants filed a post-trial motion for judgment notwithstanding the verdict or a new trial, which the circuit court denied after a hearing.

On appeal, the Prassas defendants contest the propriety of the circuit court's denial of their motions for a directed verdict against Tarulis and their motion for judgment *n.o.v.* They claim that the court should have granted their motions because Tarulis failed to establish that it was their actions or omissions that caused his injuries. Without testimony from Rathz that she hit the wheel stop because she did not see it due to its lack of visibility and that in turn hitting the wheel stop caused her to lose control of the car, they contend, Tarulis cannot be said to have proved by a preponderance of the evidence that Tarulis' injury was caused by the Prassas defendants' alleged breaches of duty. As for slope, they note that Keiser, Tarulis' expert, testified that "if the maximum slope is exceeded, your sight lines are decreased and a safety problem exists," but neither Rathz nor Keiser testified that the slope of this driveway decreased Rathz's sightline such that she could not see the wheel stop. Thus, the Prassas defendants conclude, the jury's verdict as to liability was based on impermissible "speculation, guess and conjecture" as to what Rathz might have done if the driveway and wheel stop had been better marked, or if the wheel stop were located farther to the east.

Tarulis counters that the circuit court did not err in denying the motions because he presented sufficient evidence of the elements of negligence by the Prassas defendants. He argues that the two experts testified as to the elements of the applicable standard of care and the Prassas defendants' noncompliance with that standard. In addition, he stresses that Rathz testified that she hit the wheel stop and lost control of her car; Keiser testified that due to the wheel stop's location and lack of contrast, it was difficult to see; and even Box testified that a driver who hit a wheel stop could injure others. In Tarulis'

view, this evidence and the reasonable inferences it allows amply supported the jury's verdict.

The Prassas defendants rejoin that they had not raised the question of the existence of duty or its breach, but given that Tarulis briefed it, they argue that the wheel stop was an "open and obvious condition" and Tarulis presented no evidence that Rathz was distracted when she hit the wheel stop. In addition, they reiterate their earlier argument that Tarulis failed to demonstrate that their acts or omissions caused his injuries.

■■ ■ We begin our consideration of this case by observing that to prevail in a negligence case, the plaintiff must demonstrate that the defendant owed a duty to the plaintiff and that the defendant's breach of that duty factually and legally caused the plaintiff's injuries. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140, 554 N.E.2d 223, 226.) When the jury is the fact finder, a motion for a directed verdict or a motion for judgment notwithstanding the verdict asks the court to decide whether there is sufficient evidence to present a factual question for the jury. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 498-502, 229 N.E.2d 504 (scintilla of evidence for non-movant is not enough); see also *Weldon v. Hawkins* (1989), 183 Ill. App. 3d 525, 539 N.E.2d 229 (explaining different standard for bench trials).) Such motions should be granted "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick*, 37 Ill. 2d at 510; *Ward*, 136 Ill. 2d at 139-40, 554 N.E.2d at 226.) This standard is a demanding one, but it was met here.

Tarulis cites to *Ward* in support, but his reliance is misplaced given the issue before us. Although the court in *Ward* reversed a judgment *n.o.v.*, the question presented was whether the defendant store owner had a duty to protect the plaintiff customer from the risk presented by an obvious condition, a post located just outside the entrance to the store. (*Ward*, 136 Ill. 2d at 140, 554 N.E.2d at 226.) Here, as explained above, the question is not the existence of a duty the Prassas defendants owed Tarulis but whether Tarulis presented evidence that raised a factual question concerning the connection between the Prassas defendants' alleged breach of duty and his injuries.

Tarulis' attempts to distinguish the cases cited by the Prassas defendants are similarly unpersuasive. For example, in *Monaghan v. DiPaulo Construction Co.* (1986), 140 Ill. App. 3d 921, 489 N.E.2d 409, the plaintiff had no recollection of the vehicular accident in which he was injured and thus was unable to demonstrate that he hit the

defendant municipality's median strip, that he did so because it was not readily visible, and that this condition was due to the defendant's breach of duty. The court granted summary judgment for the defendant, finding that the string of inferences was "merely speculative." Although the court predicated its decision on the lack of evidence that the plaintiff had struck the median, it also commented that even if he had done so, "the mere possibility that he did so by reason of any alleged breach of duty by [the defendant] is not sufficient to show proximate cause." (*Monaghan*, 140 Ill. App. 3d at 925, 489 N.E.2d at 411.) Although here, Rathz testified that she struck the median, Tarulis, like the plaintiff in *Monaghan*, depends on the inference that she struck it because she did not see it and on the further inference that she did not see it because it was not readily visible. Like the court in *Monaghan*, we find these inferences "merely speculative."

Likewise, in *Kellman v. Twin Orchard Country Club* (1990), 202 Ill. App. 3d 968, 560 N.E.2d 888, *appeal denied* (1991), 136 Ill. 2d 544, 567 N.E.2d 332, the plaintiff was unable to produce evidence that a defect in the defendant's shower stall, if any, caused her decedent to fall. The court affirmed summary judgment for the defendant, commenting that "[d]amages cannot be awarded on mere speculation, guess, or conjecture as to what probably happened to cause decedent's injuries and death" because "[t]he possibility that the alleged unreasonably dangerous shower stall and basin had caused decedent to slip and fall is insufficient to establish a causal relationship between defendant's alleged negligence and decedent's injuries." (*Kellman*, 202 Ill. App. 3d at 974-75, 560 N.E.2d at 891-92.) Here, similarly, the possibility that the wheel stop's poor visibility caused Rathz to hit it is insufficient to establish a causal relationship between the Prassas defendants' alleged negligence and Tarulis' injuries.

At trial, Tarulis presented evidence that, given the slope and marking of the driveway and the wheel stop's placement and coloring, the Prassas defendants should have made the wheel stop more visible but they did not. In doing so, he presented factual questions about the nature of the duty of the Prassas defendants toward him and their breach of that duty. Tarulis also presented evidence that Rathz hit the wheel stop and that she then lost control of her car. Nevertheless, we agree that Tarulis presented no evidence to forge the causal link between the Prassas defendants' alleged breaches of duty and Rathz's hitting the wheel stop; that is, he failed to present evidence that Rathz hit the wheel stop either *because* she was in fact unable to see it due to its placement and coloring or the slope and definition of the driveway, or *because* even though she was or should have been aware

of it, she was momentarily distracted. As the Prassas defendants argue, Rathz herself did not testify to either effect, and Keiser testified only that the stop was difficult to see, not that Rathz had not seen it. Thus, even if we assume that the Prassas defendants breached their duty to Tarulis to exercise reasonable care to keep the parking lot in a reasonably safe condition, and even though it is possible that Rathz hit the wheel stop because of the Prassas defendants' breach of duty, this possibility is not enough to establish proximate cause. As a result, when we view all the evidence in the light most favorable to Tarulis, the evidence *in toto* "so overwhelmingly favors [the Prassas defendants] that no contrary verdict could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

In sum, the circuit court erred in not granting the Prassas defendants' motions for a directed verdict against Tarulis and for judgment notwithstanding the verdict because Tarulis failed to present evidence that the Prassas defendants' alleged breach of duty was a cause in fact of his injuries. Therefore, we reverse the judgment of the circuit court.

Reversed.

SCARIANO and McCORMICK, JJ., concur.